I want to talk first about the strength of the government's proof as it relates to the Dying Declaration, the Canberra evidence, some of the discovery problems we had, and hopefully if I have some time left over, if I don't get too many questions, we'll talk a little bit about the recusal and the waiver of the privilege. Yeah, I would suggest, because this case, obviously, I think we've all, we're all prepared on what's submitted, there are a lot of issues because it was a trial and it's a complicated case, you know, go with what you think are your strongest issues. All right. Thank you. So what was the proof with respect to whether Mr. Joseph had a gun and whether he fired a gun in the shooting? Mr. Saul and Mr. Nixon Maumalanga both testified on direct that Joseph participated in the shooting. Both of these witnesses were easily impeached by their prior statements, which were either recorded and or reported. Mr. Saul, of course, said in the initial statements he was shot at point-blank range, right in the nose. He went down on the pavement and he was hurt. So is this your sufficiency of the evidence claim? No. I really want to talk about harmless error and whether or not there's harmless error here with respect to the Dying Declaration and the Canberra evidence. Okay. So it's the strength of the case as it relates. It's the strength of the case relative to the shooting because both the court let in the Canberra evidence and the Dying Declaration, which was Mota and Joseph shot me. So, one, did he have a gun? Saul, of course, in the initial statements, he got shot point-blank, he fell down, he heard Mota saying, shoot him, Kevin, shoot him, referring to Gonzales, and that was it. He was out. Well, if we're really talking about the Dying Declaration, rather than reciting again evidence, how are you going to distinguish this from Michigan v. Bryant? Well, on the Dying Declaration, the court actually didn't make any ruling with respect to the Crawford issue. And I think the government now is asking this court to make those findings, basically for the court, to get past Crawford. Michigan v. Bryant and that line of cases about the emergency situations is a difficult problem for us. Right. But one thing we did not address in our briefs, which we should have, was the argument that's contained in Mota's original filing on this issue. This was Mota's motion, actually. It's document number 440. And what Mota addressed at that point was that we don't have a confrontation issue. Why do we have any issue as to the Dying Declaration? You would still have an issue as to Ohio v. Roberts on a reliability issue. You know, there was problems with the reliability of that statement. And what would be my standard of review on that issue? Wouldn't that be abuse of discretion of the district court? Well, the problem really was that she didn't make any ruling. The only ruling that the Court made was that forfeiture by wrongdoing did not apply. Did she not make a ruling because nobody objected? Well, you know, I should get the ---- If she didn't, then it's plain error. Well, there was a motion in Livia that was filed. And when the Court dealt with it, she said, I'm not going to deny the motion. I'm not saying it's coming in. You know, she just left it open. She really actually didn't say much about whether it was a Dying Declaration. She didn't address Crawford except to say that forfeiture by wrongdoing ---- Well, then that doesn't excuse you from not making an objection later if it's not really done. You know, what happened was, and I have the citation here, is that when we started the trial, the Court informed us that we didn't need to renew all of the objections that we made, that any motion in Liminy that we made previously would be deemed renewed. But if they didn't rule on it, then you still have to ---- you can't ---- there's nothing to preserve. If you're claiming that she didn't actually rule on something, then what are you preserving? No. What was preserved was the motion in Liminy. And the cite would be February 4, document number 1014 at page 112, was when I asked her, do we need to stand up and renew all of these motions? And she said, no, you don't need to do that. But didn't you just tell us that the judge said a ruling against your motion in Liminy doesn't mean I'll let it in? I thought you argued that. She said I'm not going to rule on whether it's coming in. Let's see what kind of foundation they lay. Didn't that indicate that you should make an objection at the appropriate time? Well, we didn't because she told us that when we started the trial that we didn't need to renew these objections. So you just let the evidence come in without even doing anything about it? Well, that's what occurred. But she did tell us there's no need to renew it. And the only finding she made at the time was forfeiture by wrongdoing, which was clearly wrong. Well, that's the reason I pushed you a little bit. If it isn't a Crawford issue, then I think it's an abuse of discretion issue. And if it's an abuse of discretion issue, then I've got to find a reason she abused her discretion, either implausible. Well, with respect to the Dying Declaration, if you get past the Crawford problem, what I'm asking you to consider is there still is a reliability issue about that statement. And, therefore, I can look at what she did and see if on the reliable issue what she did was implausible? Well, unfortunately, she never reached that issue because she said forfeiture by wrongdoing would apply. And since it doesn't apply, the government is now asking you to make the finding that Crawford – if you do the Crawford test, it's non-testimonial. And all I'm suggesting is if you are going to do that, then you should also look at the reliability of that statement. You might want to go to your next issue, since we've kind of exhausted that and you've only got $350. All right? I spent a lot of time on the Canberra issue, and I had a little bit of difficulty understanding whether it – well, whether Joseph was even subject to interrogation when he met with the police, because he asked the police to meet with him, and his counsel was there, and Joseph volunteered a lot of information about the shootings without any prompting from the police, and the police asked one clarifying question. So I'm having trouble even seeing where it's an interrogation and how – I guess that – you spent a lot of time on that, but I'm having trouble seeing how you would prevail on that. Well, you know, on the Canberra issue, we started from the assumption that the court had ruled there was a substantive Fifth Amendment violation by way of the ineffective assistance of his attorney throughout that interrogation, throughout that meeting with the police. And our position was that the government did not file a cross-appeal in this case. We should not be back revisiting that portion of the proceedings. Well, but on the – if it's on the admissibility of evidence, can't we admit it under any ground that we feel it would be appropriately admitted? Well, my understanding would be if the government did not challenge the court's order, and the order was suppressing the statement, all of his statement, both pre-Miranda warning and post-Miranda warning, then once – But say if it wasn't even an interrogation. You know, I'm having trouble seeing even how it was an interrogation. Well, certainly what – I think the argument is that – But your client called the meeting, came with his lawyer. The police only asked one clarifying question. Well, you're talking about the pre-Miranda session. Yeah. Yeah. But certainly it proceeded from there into a classic interrogation. But if that wasn't an interrogation and you're trying – then you're trying to claim that it all is sort of the fruit of the poisonous tree, right? Correct. But if it wasn't even an interrogation, then there's no problem. Well, if there wasn't an interrogation, then the court never should have suppressed the statement, correct. But my – our position is that that was never appealed by the government. And since it wasn't, we should be here looking simply at the issue as to the fruits. And the issue as to the fruits has to do with the distinction between whether this was a fair-to-warrant type of situation or whether it was a substantive violation, which is this – which is talked about in the pertaining case. Okay. Well, you're down to one minute, unless my colleagues want to ask any questions. I don't have any more. I'll have you repeat. I don't have any more questions on camera. Okay. Then did you want to ask any other questions of counsel? No, not on camera. But if he's got other issues, I'm interested in what he's got going on. Well, we're also interested in the – we feel that of the 11 issues we file, we have strong issues with respect to the refusal as well as the waiver of the privilege. You know, this was a situation where the court allowed his attorney, basically, to go and confer with the government without complying with the Ninth Circuit cases of Bideker and Amlani, which talk about having that attorney give to the court an in-camera hearing to explain what the scope of the communications were so that the court could tailor the release of a portion of that information to the government. And though we requested that more than once of the court, it was never done. She simply had counsel go and meet with the government to talk about what he had discussed with Joseph, even though in our claim of ineffective assistance, it focused primarily on what was in that videotape recording. It had nothing to do with their privileged contact prior to that. All right. Thank you. Good morning, Your Honors. May it please the Court, my name is Georgia McMillan. I represent Ethan Moton Appeal. I'd like to focus my argument this morning on the Sixth Amendment issue that we raise in our brief, our first argument. I'd also like to reserve one minute for rebuttal as well. I'd like to nail down this argument this morning and argue that this was a Sixth Amendment encounter, that the government deliberately elicited incriminating statements from my client, that notwithstanding the impeachment rule from the Supreme Court, these statements should not have come into the trial. And finally, I'd like to address the government's issue that we waive this. Well, is it just so that we understand this, that it's my understanding that the court said, okay, the government can use them for impeachment, but then you decided to go ahead and introduce it on, I think it was on your redirect or something along those lines. And why is that not the death knell for you? I don't think that it's the death knell, Judge Callahan. Because if you introduce it, how can you claim, like, it shouldn't have come in when you put it in? Well, because the prosecutor did not violate the ruling of the court. You're the one that got it in. And once it's in, if no one objects, then it's evidence before the court. I think we have to look at the circumstances of how it, how we got to the point where my client had to make this decision as to admit it on his redirect. Well, give me a case that says if you introduce it, that then later you can complain about what you did. I don't have a case, Judge Callahan. But if I could. Especially in our circuit. I mean, in our circuit, there is some circuit precedent which would suggest there are, if you're trying to anticipate that this is going to look bad for you, you might be able to say something about it. But in our circuit, we got a case right on point that says that isn't the way it is. If you're going to say something about it, you're dead. You can't object. Well, Judge Smith, could we not consider the circumstances, though? The circumstances. The circumstances. The trial proceeding circumstances that led my client to make this decision that If I had a case that would get me to the circumstances, I'd be glad to look at them. That's what I'm really at. That's why I thought Judge Callahan's question was especially relevant. In our circuit, we have to follow our circuit law. And our circuit law would suggest if you're going to start talking about what you don't want in, then they can come up with what they have to say about that same thing. However, Judge Smith, the reason why he decided to do that, he didn't want to talk about it in the first place. Pretrial, he filed the motion to suppress. The judge ruled that it could come in on impeachment, but the government decided not to bring it in, not to admit that Exhibit 149 during cross-examination, that the government would bring it in on rebuttal. At that point, we see my client's trial counsel basically begging the court for an opportunity after the government's rebuttal to have an opportunity to discuss his interpretation of this recording. And the district court would not guarantee that. She said, you have no, I'll give you no guarantee of what they call surrebuttal. Well, you're in a rock, you're between a rock and a hard spot. But what Judge Smith is saying is our circuit says even if you're between a rock and a hard spot and you don't have the choices that you want, there's still a case that says you introduce it, you own it, and then you can't complain about it later. That's our problem. I mean, I see the cases in other circuits which would suggest some limited exception to that general rule. But then I said to my law clerk, go out in my circuit and find one just like that. Seems to me Mada wins. He couldn't find it. In fact, he found just the opposite. So Mada loses. I mean, that's my worry. Well, it's our worry too, Your Honor. Let me ask you another question. Certainly. Why should we entertain your argument that Mada's statements were not voluntary when nobody made that argument to the district court? On plain error, I submit. The court should consider. On plain error. Yes. Well, but when Mada agreed to have these statements come in for impeachment only, he never made any argument to the district court that involuntariness should prevent the evidence from being used. Well, Judge Smith, just to clarify, when Your Honor is speaking about voluntary and involuntariness, now you're referring to the coercion aspect or the knowing voluntary waiver of right to counsel. We've never made the argument in our brief that this was a sort of a badger the guy kind of a situation where the police have them under the white lights. That didn't happen in this situation. In fact, our argument is that the whole point in sending in Monalem was that he was my client's cousin, and Monalem testified. He said, I knew Ethan Mota would talk to me because he trusted me, because we had known each other since we were kids. But your whole argument about it being involuntary was not made to the district court. That was my problem. If I'm going to have it made to me, it's got to be made to her. What we were really talking about is whether it ought to be used in direct evidence or whether it could only be used in impeachment, not whether voluntary or involuntary. Well, I'm still having a little trouble with the notion of voluntary, involuntary. I would like to move the discussion toward using that phrase, voluntary, involuntary, with respect to knowing involuntary waiver of Sixth Amendment right in contrast to the coercive, compelled sort of a situation. So you're importing the ineffective assistance of counsel into involuntariness, correct? No, Judge Callahan. I'd like to speak about it with respect to not having the opportunity to knowingly and voluntarily waive his right to counsel. Our ineffective assistance of counsel argument is a different argument. Judge Smith. I agree with that. My time is quickly going. I would just like to get to Your Honor's issue about voluntariness and our issue that this was not a knowing and voluntary waiver of Sixth Amendment right. We think that the case law supports us, that even if these statements could have come in for impeachment reasons, the case law indicates that you still have to show that the Sixth Amendment right to counsel was knowingly and voluntarily waived. And on this record, we simply don't see that. Okay. I understand your argument. Do you want to hit the ineffective assistance argument, or what other argument do you want to hit? I think we understand. I'd like to briefly talk about our argument concerning the district court's denial of the motion to disqualify itself. We raise this issue under two sections of Section 28 U.S.C. 455. First, 455A, going to the appearance of impartiality. Why isn't this just a situation where someone ruled against you, and then therefore they're impartial? I mean, judges have to rule, and someone has to win and someone has to lose. And if every time after that the person that loses says, well, now you're not impartial because you've ruled against me, what more do you have here? Certainly, Your Honor. We think that the facts support the argument because, first, when the judge ruled, she had already reviewed the pre-sentence reports for my client, for Mr. Joseph, and for a host of other co-defendants in this case. She had already taken their pleas. Moreover, she had taken the second plea of the co-defendant, Kevin Gonsalves. Well, but as trial judges, we very frequently, and I was one, that everyone that we have hearings of really prejudicial evidence, and then we decide not to admit it. And then sometimes even people waive jury after that and want you to decide it. And, you know, judges hear all sorts of things, and you're asking me to believe because they know too much or because they rule on certain motions that that in and of itself makes them incapable to do the rest of the case. And you're setting the standard that it seems that every judge that's ruled that something doesn't come in, then the bell can never be unrung, and that can't be right. I don't mean to make the argument, let the argument go that far, Judge Callahan. What we attempt to show in our brief is that given those factors and also the taking of the second plea agreement for Kevin Gonsalves, we think we've shown prejudice in the record. Let me ask you this. What's the standard of review? The standard of review, I believe it's abuse of discretion. So I'm to say that this district judge, knowing the facts that she knew and knowing what her situation was and you full well knowing it as well, reviewing the record as she did, made an implausible decision on this issue. On this issue, yes. Implausible. No way she could have got there. I mean, I read what she said. I read the standard is a reasonable person with knowledge of all the facts would conclude that the judge's partiality might be questioned, and she's the one to make that decision. And I'm supposed to find that she had an implausible way to get there. I also saw what she did in this record. I mean, she gave this in the decisions that she made about what would even be used at trial. She limited how one could use the information, which she didn't need to do. I mean, she did all kinds of things in this particular case, which would suggest there was no prejudice. So I'm, again, trying to figure out on a plausibility basis how I could suggest she should have recused herself. Judge Smith, don't we see the district judge even call into question her own judgment when she looks at the Kevin Gonzalez ex parte briefing situation? And she filed a very lengthy order, which we have in the first volume of our excerpts of record, in which she suggests that this may be the time when she needs to recuse herself because she's been privy to all this ex parte information. But then upon hitting that particular event, she said, I'm going on. She did, and we think that she should not have done so. Again, abuse of discretion. She has the first judgment on that, and I have to ‑‑ I can't come down and substitute myself into her spot and say, well, I'd have done this, so you ought to do it. I have to say, is there no basis for her to have done that? This is abuse of discretion. Yes, and, Your Honor, when we look at the sentencing record for Kevin Gonzalez, it seems to me clear that we see prejudice throughout that sentencing record in the way that she discusses these shootings that are, you know, the bottom line here. She talks about the horror of the shootings. She discusses the fact that the victims were lured. I guess the whole thing, does the judge have to think that someone's innocent in order to do their trial? I'm sorry? Does the judge have to think that someone's innocent in order to do their trial? Because you do review a lot of the evidence before you even start. Or do you just have to think that you can be fair and that others, that, you know, that you can be impartial? You're not going to decide whether they're guilty or not guilty, right? To be sure, Your Honor, the judge must be impartial, but it seems to me that moving forward toward the trial, we've got this series of rulings, especially with this really messy situation that happened with these plea agreements and then the Kevin Gonsalves' second plea agreement and then his sentencing that strongly suggests that we now have a partial judge and that she should have recused herself. All right. We've gone way over your time, but I'll still give you a minute for rebuttal. Thank you so much, Judge. Thank you. Good morning. May it please the Court, John Palateri on behalf of the United States and trial attorney Tom Brady from Hawaii is here as well. Are you going to use all the time, though? Whatever time is necessary to answer the question. No, but I mean you're not sharing time. Oh, no, we're not sharing time. No. Okay. Thank you. The only limitation on the government's use of the monolingual recording and the testimony of Mr. Monolingual was the government's agreement at the beginning of trial not to use that evidence in the government's case in chief and only to use it if Mata were to testify and to impeach him. There was no Sixth Amendment limitation on this evidence. Just to be clear, there were separate sovereigns at issue here. At the point of the interview with Monolingual, Mr. Mata had been charged in state court. In Hawaii state court, there were no Federal charges pending. And the Mr. Mata cites the Texas v. Cobb case, which decided that for purposes of determining whether offenses are the same in the Sixth Amendment interview context, courts applied the Brockberger test. And courts throughout the country, courts' appeals throughout the country have determined that the separate sovereign test applies as well. So just to be clear, and I could direct the Court to the Warshlow case in the Second Amendment, that's the case in the 11th Circuit, 519 F. 3rd, 1307, and those apply that rule. So the only limitation was the government's agreement not to use it, essentially to abide by the rules that would apply if there were a Sixth Amendment violation. And that's what the government did and only used it for impeachment. And then Mr. Mata introduced the tape into evidence. And at that point, that opened the door to use of the tape for all purposes. Well, let me ask you this on the Canberra evidence. Yes. The district court held the statements and derivative evidence obtained in violation of the Fifth Amendment prophylactic right are admissible if they are voluntary. But were Joseph's statements voluntary if his counsel was ineffective? That seems to be part of the claim. In this record, there's no claim that his statements were nonvoluntary. There was no coercion. And the standard for coercion, this is a due process standard that's applied. Well, I'm hearing an argument in their importing. If you had ineffective assistance of counsel, then you can't really voluntarily speak. Well, there, to be clear. And that's what I was trying to say. Is there really case law to support that interpretation of voluntariness? I'm not aware of it. And here's why. The Supreme Court has made clear that coercion, for a statement to be coercive, there must be coercive practices on the part of the State. So there's the Colorado v. Connolly case. And in that case, a mentally ill individual thought that God was telling him to confess to the police. And he walked into the police station and confessed. And there was no coercive action by the government. And the Supreme Court held in that case. God wasn't really telling him? No. And in that context, well, we don't know. But in that context, the Supreme Court said there could be no coercion for purposes of the due process clause. The statement was voluntary for purposes of the due process clause because there was no coercive action by the State. So in this context, there's no suggestion at all of any coercive action by the State. Well, you – I know that you believe that the Canberra evidence was admissible. But what do you think is the strongest support for that? And was it the way that the district court approached it? Or is there a better way to approach that? There are many, many reasons why the Canberra evidence was admissible. And they're all very strong. Number one, so there were two parts of the questioning here. There was the pre-warning and the post-warning. The pre-warning clearly was not interrogation. It was Mr. Joseph's attorney getting an attorney proffer. Who called the meeting? Mr. Joseph and his lawyer called the meeting. The government, the State did not initiate this meeting. Joseph turned himself in, and he was in custody. And then he told the police, I want to provide a statement. And the police waited until he talked to his counsel. They didn't approach him, ask if he wanted to make a statement. They only communicated through counsel. And then the next morning, he was there overnight, had time to think about this. He talked to his attorney the evening before, thought about it overnight, talked to his attorney the morning before, had private meetings with his attorney. And then his attorney initiated this contact with the police and said, I want to talk to you. And so there's no suggestion. So when were the Miranda warnings? So there was some questions. So at the beginning of this meeting, Joseph's counsel started providing what he termed an attorney proffer saying, this is what happened, this is what I understand happened. And then at some point, the counsel started to elicit information from Mr. Joseph, and Mr. Joseph started to speak. And then at some point, the police officer said, and this was directed toward the attorney, so he was facing in this direction when it happened, because it wasn't clear what direction Joseph was facing. And instead of Joseph's lawyer responding, Joseph responded, I was facing in X direction, not Y direction. And that was the only – and so that was not a questioning on the part of the police. That was essentially just a clarification of information he already provided. And then toward the end of this, there was some discussion about the cooperation, and then the warnings were read. The warnings were provided both orally and in writing, and Mr. Joseph signed the form that provided all the warnings initially indicated he understood them. Was this attorney with him during this? Yes. Now, that would have been an interrogation after the Miranda warnings. Yes. There was questioning of him at that. He was in custody, and there was questioning. And it was all voluntary. And, in fact, the police informed Mr. Joseph that it was their subjective understanding, which we disagree with, but it was their subjective understanding that what he said before the warnings couldn't be used. It was no good, and so we have to give you these warnings, and then we're moving forward. That was their, the police officer's, subjective understanding. But, again, we think that's wrong for several reasons. One, Mr. Joseph's counsel was with him, and so there was no need even to provide the warning under the courts that have addressed this question when an individual voluntarily provides a statement with counsel present. Well, if it had been interrogation before the warning, would they have had to give the Miranda? No. And this, there are, there's no court of appeals decision, federal court of appeals decision holding this, but there are district court decisions. There's Judge MacCasey's decision in the Southern District in New York, and there's the very thoughtful opinion of the Massachusetts Supreme Court holding this, that when a, when an individual voluntarily provides statements with counsel present, there's no need to provide Miranda warnings, because the whole purpose of Miranda warnings are to dissipate the inherently coercive aspect of custodial interrogation. And, in fact, in the Miranda decision, the Court made clear that in the cases before the Court, the presence of counsel would have allayed those concerns. Your, the district court disagreed with what you've just argued. Yes. And ruled against you. Yes. And held that you could not introduce it in your case in chief. Yes. You haven't filed a cross appeal on that. Yes. And this is not a. So why, why should we listen to your argument on that? Well, this Court can affirm the judgment of deciding to, to admit the Canberra evidence on any grounds that are apparent from the record. This is not a case where. Well, the Canberra issue, I think, is different, isn't it? Well, the Canberra issue rested on this notion of fruits of the poisonous tree. And so a, a predicate of that ruling is that the tree was poisonous. And so if the tree is not poisonous, the Canberra evidence comes in automatically. And it's our position that the tree was not poisonous, and the Court can uphold the admission of the Canberra evidence on that basis, and should. And this is not a, a situation, for example, in the, the Green Law case in the Supreme Court, where the, where the Court of Appeals sua sponte increased the defendant's sentence on the basis of a, a, a mandatory minimum that had been overlooked by the parties below, and the Supreme Court said, no, there was no jurisdiction for the Court of Appeals to do that because the government didn't cross appeal. The government was happy to, to rest on the sentence that the, that the Court, the district court had imposed. So here we're not asking the, any additional sanction or additional punishment. We're just asking that the Court affirm the judgment on the basis of what's apparent in the record. So there's no, there was no need for the Court, for the government to cross appeal in order for us to, to argue that the tree was not poisonous. Let me ask you a couple of questions about the Mata recordings. How come the government didn't do anything about these Mata recordings for years? Only disclosing them the eve before trial? Well, the record shows that the, there were Why didn't they? Disclose them? Because Or the eve before trial? Because no one, the, the, the prosecution team didn't know about them until the eve before trial. They had them. They were, the FBI, the government had them collectively, yes. The prosecution team, the attorney prosecuting this, the agents on the prosecution team didn't know about this recording until the eve of trial when an agent was in the, the storage facility for this case and collecting everything before trial and pre-trial preparation and came across this tape. All right. The government played this tape multiple times during closing argument. It replayed, the tape was replayed for the jury during deliberation. The government questioned Monalem about the testimony on direct exam. Why isn't this something that is different than U.S. v. Williams? Well, this is, if, if Williams is a case that Williams is the case which you've got to decide if you're going to go where you're going to go to let this in. Am I correct that it applies to the older decision? Because the older decision says The older decision is Williams. It's a 91 decision. That's not too old of me. No, older. It might be real old. Excuse me. Older. O-H-L-E-R. Yeah. Same. As well as Supreme Court. Did you just call us old? No. I apologize if I suggested that. Yeah. The older decision in that, in that context what occurs is, and this is not entirely analogous, but it's a helpful decision. What occurred in the, what occurs in that context is when the defendant files a motion in Limine saying, I don't want the government to use past offenses to impeach me. And the district court says, motion denied. I'm going to allow the government to use your past offenses to impeach you. And then the defendant testifies, and then on direct, the defense counsel elicits these past convictions to take the sting out of what would occur if the government elicited them. And in that context, the Supreme Court in Oler, 529 U.S. 753, has made clear that the defendant cannot challenge that determination on appeal, cannot challenge the district court's in Limine ruling. Well. Now, here. And you're suggesting this is like Oler? It's like, but not on all fours with Oler. Now, here, Mr. Armando didn't, he didn't use the tapes and say, yes, I made that statement. Yes, I made that statement to take the sting out of the government saying he made those statements. He went into a whole explanation for what they meant and what he was talking about. He was talking about substantively what he said. Well, but the bottom line is the only reason they introduced it would be to take the sting out. I mean, why get into it at all? Well, if they didn't have a sting coming, they wouldn't have brought that in. Well, it's a little different than the sting of a past conviction. Because here, he didn't say, yeah, I made it, and so I'm, this sting of a past conviction is saying, yes, I'm going to admit to it so that you're not holding it against me that I withheld you on direct. Here, he could, to use it in the same manner, he would have said, yeah, I made those statements. So don't hold it to me. I'm not trying to hide from them. But, no, he didn't do that. He said, well, I meant this, and I shouldn't be, this is what I meant there, and I didn't. And he used it, and he talked about them substantively as to why the jury should not consider them. Well, how much he said to eliminate the sting might be subject to argument, which I guess you're making. My worry is, and this is the ultimate question, we decided Williams in 91. Oler came out in May of 2000. Since then, the federal rules of Evidence 301 have been changed. And under those rules, the notes to the rules specifically say that this does not purport to answer whether a party objects to evidence that the court finds admissible in a definitive ruling and who then offers the evidence to remove the sting of its anticipated prejudicial effect, thereby waives the right to appeal the trial court's ruling. Now, given that the rules have changed, and given that Williams was before that, and given that Oler was before the rules changed, there's certainly a circuit split on this. Is this something we ought to send up for an en banc court? No, and here's why. Because this is not the admissibility of this evidence was not premised on any provision of the federal rules of evidence. Moda argued that there was a Sixth Amendment violation. The government said no Sixth Amendment violation, but we're going to agree that we won't use it in our direct because, to be honest, we only founded the eve of trial and we thought that was fair. And so we abided by the rules as if there were a Sixth Amendment violation, even though there was not. We didn't have to do that. We could have argued no Sixth Amendment violation and we're using it in our case in chief. And so there was no provision of the rules of evidence or any provision of the Constitution that prevented us from using this as substantive evidence. It was purely our acquiescence based on the legislation. You're saying the judge didn't rule on the motion in limine? She said on consent, essentially. You guys can agree. The government agrees. You agree. So I'm not making any ruling on the Sixth Amendment issue. And so based on your agreement, I, yes, I grant the motion. That was the basis for the ruling was the stipulation, essentially. Let me move to another issue. How can a lawyer's misreading of a statute and failure to object to the court's misreading be anything other than Am I correct that you're referring to the mandatory minimum of the bylaw? I am. Yes. Well, I would say that every lawyer, a room full of lawyers, did not see this. And the determination of whether there's some sort of ---- Didn't Eddins admit that he failed to even consider the mandatory minimum? Yes. And it's not, even if ---- Didn't the court even fail to discuss the mandatory minimum? But even if it was below a reasonable performance by counsel, there was no prejudice at all in the determination here. Well, didn't Mata forever lose his chance to develop the record? No. In a way that illustrated his eligibility for the substantial assistance? No. Not at all. He could have ---- Why? Because right after the court rejected the plea agreement, he could have gone to the government and said, I'll testify against these people. There was nothing stopping him at that point. He could have still gone and said, I will cooperate. He didn't. And he went to trial. At that point, all there was was the rejected plea agreement on the basis of the record at that point. And if he felt that he could create an additional record or cooperate in a manner that showed that he was providing substantial assistance, then he could have done that. Nothing stopped him. There was no prejudice at all at that point in time. I have no other questions. There do not appear to be any additional questions. Thank you, Your Honors. Thank you. All right. There was a question, why was there a four-year delay in turning that tape over? Well, we asked the judge for a hearing about that. We heard these reasons today. We heard some of the same reasons. It's in the storage room and all this. When we asked for a hearing about that, we never got a hearing. We asked for a hearing about why we never got the information about Tauwhite'e and Brown and Monalim's parole hearing. Again, we never got a hearing. So we're asking the Court, yes, we're talking about abuse of discretion here in terms of how the Court handled all of those discovery-type issues, and we submit there was an abuse there. Regarding the recusal, there was a question about wasn't the Court just making rulings adverse to us? Could that be a basis for recusal? You know, there was that special filing she asked for. She told Gonsalves, you want this deal? She understood we were running a joint defense. She asked Gonsalves, tell me your secrets. That's what she says. She's asking really for attorney work product. Tell us your secrets. And after I look at them, well, maybe I'm going to have to step aside. So that's what they did. They told her the secrets. She didn't step aside. I submit that that filing was something different than what you typically have. Kennedy, what did you do about the fact, after you got to the point where she said, I'm still going to look at this stuff, and I'm not going to step aside, and I don't know, I might have to step aside, but she never stepped aside. What did you do about that? We filed a motion to recuse her. Well, I understand. And so at that point, there was a hearing, wasn't there? There was a hearing, correct. And at that point, the judge, in her discretion, had to determine whether she, on the basis of all of this, that there was too much prejudice to your client, correct? Well, I submit she had to do that. Isn't that what she had to determine? She had to determine what the appearance of her fairness was. Okay. Let's even go with that question. And she determined there wasn't, in her mind, sufficient facts out there to make it happen. Now, what's my decision? My decision is abuse of discretion. So tell me, what do I have to find as an abuse of discretion? What is the standard? Well, the standard talked about in Litke had to be. Now, I'm not talking about what Litke says is what the judge had to consider. I want to know what the standard is for abuse of discretion. It's got to be implausible, what she suggests. There's nothing in the record which would sustain it. Now, you tell me that this record is implausible or nothing there to sustain it. It's implausible because she's asking Gonsalves, and she understands Gonsalves is involved in a joint defense agreement with us. She's saying, tell me your secrets. Tell me the strengths and the weaknesses of your case if you want to do this deal. And I submit that's enough. That amounts to this extrajudicial type of information, personal information that she was getting that we were not privy to, that we couldn't contest in any way. That I submit is a very unusual request of the Court, which is why she ends up saying maybe I'm going to have to step aside. All right. Thank you. All right. Thank you. All right. Thank you both, everyone, for your argument in this matter. This matter will stand submitted, and the Court is now in recess. Thank you. Everyone have a good weekend. I'm sure it will be better now that you've finished your oral arguments. We probably ruined your week.
judges: Alarcon, Callahan, Smith